UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CHARLES M. TITLOW,

             Petitioner,

    v.

RON RACKLEY,

             Respondent.

Case No. 17-cv-06690-EMC

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

## I.     INTRODUCTION

Charles M. ("Mike") Titlow filed this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 to challenge his conviction from Contra Costa County Superior Court. Respondent has filed an answer to the petition, and Mike Titlow has filed a traverse. For the reasons discussed below, the petition is denied.

## II.     BACKGROUND

Mike Titlow was convicted of murder for shooting a man with whom his adult son had a disagreement.[1] In general, the evidence showed the following: Mike Titlow's son, Chuck Titlow, was the aggressor in a road-rage incident on August 18, 2009, and twice rammed the vehicle of Ricardo Colina. Mike Titlow was not present for that event. The day after the road-rage incident, Chuck Titlow located Mr. Colina and invited several friends and his father to join him at a street location to fight with Mr. Colina. Once they arrived at that location, Chuck Titlow got out of his vehicle and began to fight with Mr. Colina. Mike Titlow stayed in his truck and shot Mr. Colina

---

[1] The two central figures in this case are the petitioner, Charles Michael Titlow, and his son, Charles Robert Titlow. Throughout the state court proceedings, the former was referred to as Mike Titlow and the latter as Chuck Titlow. This Court also will use those nicknames.

as Mr. Colina fought with Chuck Titlow. The Titlows and the friends enlisted by Chuck Titlow to join them at the fight then fled the area of the shooting and went to Mike Titlow's house. At the house, the revolver used to shoot Mr. Colina was handed off for disposal. At a gathering later that day in a garage, Chuck Titlow described to many people how his father shot Mr. Colina. Chuck Titlow's statements give rise to the bulk of Mike Titlow's federal habeas claims.

The California Court of Appeal described the evidence presented at trial:

> At 4:22 p.m. on August 19, 2009, a shooting was reported on San Pablo Avenue in an unincorporated area of Contra Costa County known as Tara Hills. Colina was found dead face down in the middle of an intersection. He died from a single gunshot wound. Mike and Chuck were charged with the murder of Colina (count 1) and Chuck was charged as an accessory after the fact (count 2). It was further alleged that Mike personally and intentionally discharged a handgun causing Colina's death.

> ***Prosecution's Case***

> *Background*

> Chuck graduated from high school in 2007. In the summer of 2009, he sometimes lived at his father Mike's house in Tara Hills on Sargent Avenue and sometimes lived nearby in Pinole with Mike's brother, Claude Titlow (Claude). Chuck was friends with Kellen Horn, Justin Stonebraker, Richie Milhollin, and Kareem Nazari, and they all hung out together all the time. Chuck drove a truck that was primered in a flat gray color.

> The prosecution called eyewitnesses to Chuck's conduct leading up to Colina's murder, eyewitnesses who were driving on San Pablo Avenue around the time of the shooting, and Chuck's friends—including Horn, who was with Chuck when he confronted Colina on San Pablo Avenue, and others whom Chuck had called to join him in a fight with Colina. The prosecution also presented physical evidence connecting Mike to the shooting.

> *August 18 "Road Rage" Incident*

> Colina's friend Nia Gordon testified that, shortly after midnight on August 18, 2009, she was riding in a car with Colina and his cousin, Jerry Owens, in Tara Hills. Colina was driving. She noticed they were being tailgated by a gray pickup truck. The truck pulled up next to them at an intersection, and Colina yelled at the driver of the truck. The driver "looked really red in the face and looked upset" and rammed his truck into Colina's car. Colina backed up and the truck hit his car again and sped off. Colina was upset; he took off his shirt, chain, and hat, and stood in the middle of the street cussing and yelling. The gray truck returned and drove up very fast toward Colina, who jumped out of the way to avoid being hit.

Although Gordon did not identify the driver of the gray truck, other witness testimony established Chuck was the driver, and Chuck does not dispute he was involved in a road rage incident with Colina.

*August 19 Before the Shooting*

Paul Petruzzelli lived near the site of the road rage incident. Owens lived across the street from him. At trial, Petruzzelli remembered that detectives had been at his house for a couple of hours the night of August 19, 2009, but he testified that he could not recall anything about that afternoon. So, a recording of his August 19, 2009, interview with sheriff's detectives was played for the jury.

Petruzzelli told the detectives that a White man, whom he thought went by "Chuck," stopped by his house around 3:30 p.m. that day. Chuck was driving a black pickup truck with a broken corner light. Chuck saw Colina and another person walking, "and he kind of like got real quiet for a minute." Then Chuck "said something to them and just [took] off down the street." It appeared to Petruzzelli "there was some type of . . . aggression" between Chuck and Colina. After Chuck drove off, Colina asked Petruzzelli what Chuck said and apparently told him about the road rage incident.

The day after the shooting, he identified Chuck's truck as the truck he had seen at his house the previous day. But, after Chuck was arrested that day, Petruzzelli was taken to view him in person, and Petruzzelli told the officers he did not know him.

*Eyewitnesses on San Pablo Avenue*

In the afternoon of August 19, 2009, Michael Brunelle was driving southbound toward Richmond on San Pablo Avenue near the First Baptist Church. He noticed three men near a small "gray primered" truck that was parked at O'Connor Drive facing San Pablo. The three men caught his attention because they seemed to be in a heated argument. It appeared that one of the men was Black, one was White, and one was Hispanic. After he drove past them, Brunelle observed the whole incident through his driver's side mirror. He saw the Black man running at an angle toward the median of San Pablo followed by the White man. Brunelle slowed down and then stopped his car in the middle of the street when he saw the men running to the median.

The two men stopped, faced each other in the left turn lane, and began fighting. The Black man was facing toward Pinole (north), and Brunelle could see his back. The White man was facing toward Richmond (south), and Brunelle could see his face. They were "throwing punches to each other, more slapping almost." The two men stepped away from each other. The White man's hands were by his side, and Brunelle did not see anything in his hands. Then a gunshot rang out, and the White man appeared "quite surprised" and "very shocked." The gunshot came from Brunelle's left. He heard only one shot. The Black man dropped to the ground. The White man ran to Brunelle's left toward O'Connor. After the shooting, Brunelle backed up to see if he could assist the victim. He did not see a red truck near the two men fighting, nor did he see a black

3

truck near the gray truck.

Another witness, Daryl Wallace, was driving on O'Connor Drive and turned right onto San Pablo Avenue (northbound toward Pinole) near the Baptist Church. To make the turn, he had to drive around a small, flat-black pickup truck blocking his way. The occupants appeared to be two Hispanic male juveniles; the driver seemed annoyed. As he drove north on San Pablo, Wallace saw through his rearview mirror two Black men walking in his direction on the sidewalk behind him. Then he heard two gunshots, and he saw the two Black men running away from the black truck. Through his rearview and passenger mirrors, Wallace saw that the driver of the black truck had a weapon, and he was in the street firing at the two Black men. He also testified, however, that he did not see the driver get out of his truck, but when he heard the gunshots, he saw a person standing in the street and assumed he was the driver of the truck. Wallace did not see where the black truck or its occupants went, and he did not notice any other cars that appeared to be associated with the truck.

*Chuck's Friends and Acquaintances*

<u>Kellen Horn</u>

Horn grew up in Tara Hills. He was Chuck's close friend, and had known Colina since kindergarten.

One evening prior to the killing, Horn and a friend, Cordon Hamilton, were at Mike's house waiting for Chuck to get off work. When Chuck arrived home, he was angry because someone had run into his truck or cut him off and thrown "[w]ater bottles or something of that sort" at his truck. Horn and Hamilton went with Chuck in the truck to "go confront the people about it," meaning "[m]ost likely fighting." As they drove by the area of the road rage incident, Horn saw Colina on the sidewalk jumping around with his shirt off and "holding onto his pants." Horn thought Colina might have a gun although he did not see a weapon. He told Chuck, "Keep driving. He has a gun." Chuck, Horn, and Hamilton then went back to Chuck's house and played video games.

The afternoon of Colina's murder, Chuck called Horn and said he had seen the people who ran into his truck walking near Horn's house in Tara Hills. Chuck told Horn he was going to pick him up "and we were gonna go fight 'em." Chuck and Horn drove around the neighborhood and saw Colina and another Black man, who all agree was Owens, walking about a block from San Pablo Avenue. Chuck then called Milhollin and Mike. Stonebraker was also called, although Horn was unsure whether it was he or Chuck who called him. Chuck told Milhollin "he had found the kids that ... ran into him and we were going to fight 'em."

Chuck and Horn drove to the intersection of San Pablo Avenue and Tara Hills Drive and waited. Horn saw a burgundy Dodge Ram truck traveling north on San Pablo. Chuck pulled out in front of it, and Horn saw that Mike was driving the burgundy truck. At some point, Horn also saw Stonebraker on San Pablo Avenue driving a

shiny black Chevy truck.  As Chuck and Horn drove north on San Pablo, Horn saw Colina and Owens on the sidewalk.  Chuck "drove up on them pretty fast and then ... pulled the emergency brake." Chuck's truck skidded to a stop at the driveway of the Baptist church within a couple feet of Colina and Owens, and they jumped out of the way.

Chuck got out and chased Colina.  Colina ran into the church parking lot and then back to the street heading south on San Pablo Avenue.  Mike cut Colina off with his truck, and prevented him from running further south. Colina ran to the median strip at the intersection of O'Connor Drive, and he and Chuck started fighting. Horn was north of Chuck because he had started to chase Owens, who had run north on San Pablo.  Horn did not run very far because Owens was "a lot faster than [him]," so he ran back to help Chuck. Stonebraker had parked in front of Chuck's truck and also briefly chased Owens.

Horn observed Colina and Chuck fighting.  Chuck hit Colina in the jaw, and Colina hit Chuck in the eye.  Chuck was facing toward Richmond and Colina was facing toward Pinole.  Horn heard a gunshot, and "[e]verybody dropped."  Mike's truck was in the lane closest to the median on northbound San Pablo Avenue.  After the gunshot, Chuck and Horn got up and ran to Chuck's truck.  Chuck had to run in front of Mike's truck to get to his truck.  Chuck seemed shocked and confused.  He said to Horn, "what the fuck just happened?"  Three trucks then left the scene headed north on San Pablo Avenue.  Stonebraker led the way, followed by Mike and then Chuck.  After they left the church driveway, Chuck called Milhollin.

Chuck and Horn drove to Mike's house, and Mike talked to them in the front yard.  He told them not to worry, and gave Horn a gun wrapped in a t-shirt.  Mike told Horn to take it to his house and keep it.  Horn testified he did not say no to Mike "[b]ecause if I would have said anything, it would have given him doubt in me of whether or not he could trust me."

Milhollin arrived at the house, and Chuck and Horn borrowed Milhollin's truck to drive to Horn's house.  Horn hid the gun in his closet.  He thought the gun was a .38-caliber revolver.  He had seen Mike with the revolver once before when Mike had it at Horn's house during a party.  Chuck and Horn returned to Mike's house, and Mike had left.  Chuck told Horn that Mike had gone to a construction site where Claude was working so he would have an alibi.  Horn thought Nazari and Nick Tormey were also at Mike's house.

Chuck and Horn went to Nazari's house in Pinole.  They hung out in the garage with Nazari, Milhollin, and Daniel Dye, who was a casual acquaintance.  Horn testified, "[Chuck] was pretty much just saying what had happened. How, you know, we got out and we—he was fighting Ricardo [Colina], and then how his dad pulled up and how his dad shot and then how we got out of there."  Horn could not remember whether Chuck "said how his dad had shot him or if he had demonstrated it."  Chuck described or demonstrated the shooting on more than one occasion, and, at trial, Horn could not

5

remember what Chuck said about the shooting in Nazari's garage and what he said at other times. Chuck said Mike's weapon was never outside the truck; the gun was inside the truck when it was fired. Horn recalled that someone in Nazari's garage said, "'Your dad must have done it,'" and someone, referring to Mike, said, "'He's a crazy motherfucker.'"

Horn testified that Chuck told him that Mike called and wanted the gun. So, he and Chuck left Nazari's house and went to Horn's house to get the gun and return it to Mike. [footnote omitted] He and Chuck drove to Mike's girlfriend's house in Rodeo and gave the gun to him. At that time, Mike was driving a small green car.

Late that evening, Chuck sent Horn a text about "Paul," apparently referring to Petruzzelli. Horn knew that Chuck talked about the road rage incident with Paul and that Chuck told Paul, "'They're going to find out who they're fucking with.'" In his text, Chuck expressed concern that Paul was "putting his name out there," and connecting Chuck to the shooting.

The day following the murder, detectives Mike Meth and Garrett Schiro interviewed Horn at his house. Horn told them about the events that led to the fight in front of the church, but he lied and said he did not know who fired the gun. He testified, "I was told not to say that" Mike fired the gun, and he did not identify Mike "[b]ecause I didn't want to be that guy who told on somebody else." He was also afraid if he said something, "somebody would come after me." Meth and Schiro told Horn they knew he was withholding information, and Horn was arrested as an accessory to murder. Chuck was also arrested that day, but they were both released within a few days without charges filed.

Sometime after his release, Horn was at Mike's house, and Mike and Chuck asked him if he talked to anybody. They had heard he told the whole story to a woman. Horn denied it, and they told him to keep his mouth shut.

Chuck told Horn that his uncle Claude had taken the burgundy truck to his grandmother's house. Chuck said they would explain any gunshot residue in the truck by saying it was from 4th of July fireworks. Chuck also told Horn "they had put [Mike's] arms in bleach" to get rid of any gunshot residue.

The prosecutor asked Horn whether, after the killing, he learned "about a plan related to what Mike Titlow was going to do at that scene." He answered that he remembered "knowing something of that," but he could no longer remember what was said about a plan.

Sergeant Tiffany Van Hook was the lead detective on the case, and she interviewed Horn at least five times. In addition to Horn's testimony, the jury heard excerpts of Horn's first and second taped interviews. In Horn's second interview, Van Hook asked if there had been a conversation between Chuck and Mike "about a gun" after the road rage incident and before the shooting. Horn responded that, the night of the road rage incident, Chuck told Mike over the phone, "I think these people have guns." Chuck later told

Horn, "'Uh, whenever shit goes down,' just call his dad."

Horn reported that, at the fight on San Pablo Avenue, nobody had a gun except Mike, and no one else was in Mike's truck. Asked whether Chuck said Mike was going to "back you guys up with a gun," Horn answered, "Yeah, he was just—he was supposed to— what (Chuck) told is he was supposed to be there. And from what [Chuck] knew before is [Mike] was going to be there with an eye on us. . . .'"

At Mike's house after the shooting, Horn saw Mike hand the gun to Chuck and say, "'Take care of this. Get it out of here.'" Mike directed them to hide the gun at Horn's house. Chuck and Horn borrowed Milhollin's truck because they did not want to carry the gun in Chuck's truck when they thought the police would be looking for it. Around 7:00 p.m., they returned the gun to Mike at his girlfriend's house in Rodeo. Horn was driving his truck at this time. In Rodeo, Mike no longer had the burgundy Dodge truck; he was in a green Honda. Horn said to Chuck that the best way to get rid of the gun was to throw it over a bridge. Horn told Van Hook, "[Chuck] just came back and told me it was taken care of," but he was not more specific.

Chuck demonstrated to Horn how Mike had shot Colina from his truck. From the way Chuck described the shooting, Horn thought Chuck knew what happened because Mike told him, not because Chuck saw Mike fire the gun. Chuck demonstrated that Mike held the gun across his chest and did not point the gun out the window of the truck. Chuck told Horn, "'He would have fucking shot me if he wasn't—if he would have been six inches more to this side.'" Horn said Mike's truck was six to ten feet from Colina and Chuck. Horn also told Van Hook that Chuck would not tell on his dad.

Van Hook testified that Horn told her of "a plan that he learned about after the shooting with regard to Mike." In his second interview, Horn reported that Chuck said the plan had been for Chuck and Horn not to get out of the truck; the plan was Chuck was going to pull his truck up to Colina and Owens, they were going to run, and Mike was going to shoot them. Similarly, in a third interview in February 2010, Horn told Van Hook that, after the shooting, Chuck told him that the initial plan was for Chuck to drive up and Mike was to take care of everything. Horn told Van Hook that Chuck did not know the plan was they would remain in the truck before the shooting, which was why Chuck and Horn chased Colina and Owens. Horn believed the only part of the plan Chuck did not know about was that they were not supposed to get out of the truck.

Horn said, when Mike gave them the gun after the shooting, he said to Chuck, "'Don't worry. This isn't my first time.'" The night Chuck and Horn were released from jail within a week of the murder, Chuck told Horn that Mike had dunked his arms in bleach the night of the shooting.

In a telephone interview in December 2012, Horn said that before the shooting, he and Chuck were waiting for Mike at Tara Hills

7

Drive, and Chuck pulled onto San Pablo Avenue after Mike arrived.

### Justin Stonebraker

Stonebraker testified that his group of friends in 2009 included Chuck, Horn, Milhollin, Nazari, Tormey, and Chris Martin. One afternoon in August 2009, Chuck called and said to meet him at Nation's Hamburger because he found "'the guys that flashed the gun on me. Let's get them.'" Stonebraker drove to Tara Hills Drive and San Pablo Avenue in his black Chevy pickup truck. He had heard about the car-ramming incident from Chuck, and he intended to help him. Horn called and said they were on San Pablo.

Stonebraker headed toward Pinole (north) on San Pablo Avenue and saw Chuck's truck on a side street to his right. Chuck was ready to make a right turn. Chuck pulled out onto San Pablo Avenue, sped up, and stopped near Colina and Owens. Stonebraker drove around Chuck's truck to follow Owens and stopped about a block past the Baptist Church. He got out of his truck and saw Owens trying to jump a fence. At this point, Stonebraker heard what sounded like a gunshot. He ran to his truck and drove away. As he drove north on San Pablo, he saw a burgundy truck that he had seen before at Claude's house. Stonebraker did not see who was driving the burgundy truck, and he did not see Mike that day.

### Richie Milhollin

Milhollin testified that his friends in the summer of 2009 included Nazari, Chuck, Horn, Stonebraker, and Martin. He drove a black Chevy truck. At trial, Milhollin did not recall the events of the day Colina was killed.

A recording of Milhollin's August 25, 2009, interview with Meth and Van Hook was played for the jury. Milhollin said Chuck called him around 3:50 or 4:00 p.m. on August 19. Chuck said he was about to get into a fight and told Milhollin to meet him at Nation's. Milhollin was with some friends at Nazari's house in Pinole Valley when he got the call. He told Nazari that Chuck was fighting, and they went to meet him. Milhollin and Martin took Milhollin's truck, and Nazari went in his own truck.

As Milhollin drove by the church on San Pablo Avenue, he thought someone had been hit by a car. He saw Colina lying on the ground. Chuck called and said, "'Shit[']s all bad,'" and to meet at his house. Milhollin drove to Mike's. At the house, Chuck "was all like scared and juiced." He was yelling and screaming and said he needed Milhollin's truck. Chuck and Horn took the truck and returned after about five or 10 minutes. At that time, Milhollin sensed Mike was the shooter.

Later that day in Nazari's garage, Chuck told everyone, "I told you we were gonna fight them motherfuckers." He said he jumped out of his truck, and Mike almost hit Colina with his truck. Chuck said he was "swinging [at Colina] and all of a sudden he heard pop, pop, pop, and then he dropped." Milhollin told Meth, "Then [Chuck] pulls me aside and tells me, you know who did it right? I was like

yeah, I can fucking put . . . two and two together, I ain't stupid. And he goes well yeah, well that gun is already in the bay now.'"

Van Hook interviewed Milhollin again in September 2009. He told her that Mike had been to his house while he was away. Mike told Milhollin's father that Millhollin should talk to Mike when he returned. Milhollin and Nazari went to see Mike at Claude's house. Mike told Milhollin, "'You're going to take this to your grave. Keep your mouth shut.'" Mike also said he thought Nazari might be talking, and he told Milhollin to tell Nazari to keep his mouth shut.

### *Kareem Nazari*

Nazari testified that he was friends with Milhollin and Martin. He knew Chuck and considered him an acquaintance through mutual friends. Like Petruzzelli and Milhollin, Nazari did not recall the events of August 19, 2009. He remembered seeing sheriff's detectives, but did not recall any of his conversations with them.

Van Hook interviewed Nazari a week after Colina was killed. He told her that Milhollin, Martin, and Tormey were at his house on the afternoon of August 19. Milhollin told him Chuck called and said they needed to go down to the Nation's in Tara Hills because Chuck was going to get into a fight and they were going to help him. Milhollin told Nazari that Chuck said he was going to fight the guys that had previously pulled a gun on him. Milhollin and Martin got in Milhollin's truck, and Nazari and Tormey got in Nazari's truck. Nazari took San Pablo Avenue and saw a body in the road. Milhollin called and told him to go to Chuck's house. When he got to the house, Milhollin and Martin were standing on the sidewalk. Chuck and Horn arrived in Milhollin's truck a short time later. Nazari overheard Chuck saying that Mike was at the fight on San Pablo Avenue. Nazari demonstrated for Van Hook how Chuck had demonstrated the holding of a gun, but he did not know whether this meant Mike or Chuck shot the victim.

Nazari told Van Hook that Chuck and Horn were at his house later that evening. Milhollin, Tormey, Martin, Dye, and Nazari's girlfriend were there. Nazari also recalled receiving a text from Milhollin about the gun being thrown over a bridge.

On the Sunday after the shooting, Nazari and Milhollin went to Claude's house, and Milhollin spoke with Mike alone. Later, Milhollin told Nazari that Mike was worried that Nazari was snitching.

### *Nick Tormey*

Tormey testified that he was friends with Nazari and hung out with Milhollin, Horn, and Dye. He did not know Chuck. One afternoon in August 2009, he went with Nazari in Nazari's truck. He thought they were just meeting a friend. On San Pablo Avenue, it appeared someone had been hit by a car, and Nazari drove to his friend's house. After they arrived, Chuck and other people arrived at the house; Chuck appeared frantic and paranoid. Tormey asked if they saw the man that had been hit by a car, and they said the person was

not run over. Tormey saw Mike arrive at the house around the same time in a green Honda. He also seemed frantic and paranoid.

Tormey was at Nazari's house when Chuck and Horn arrived there later that evening in a white truck. Chuck stayed for about 10 minutes. He said Horn was in the car with him when the fight started, and Horn was worried about being a suspect in the shooting. Chuck said his dad was there, and he thought his dad shot the victim. Everyone said they should throw the gun off a bridge.

*Additional Evidence*

A pathologist conducted a postmortem exam on Colina and recovered a bullet from his body. Colina died from a single gunshot wound of the neck and chest that caused him to bleed to death. The pathologist concluded the gun would have been more than 12 to 15 inches away when fired.

A firearms expert testified the bullet recovered from Colina's body was lead and, based on its size and markings, was discharged from either a .38 Special or .357 Magnum revolver.

The day after Colina was killed, the sheriff's department searched Mike's house. A holster for a small revolver and a box of lead .357 Magnum ammunition were recovered. No other ammunition was found. The box of ammunition held 50 rounds, and nine rounds were missing. The firearms expert testified the holster was probably an ankle or leg holster, and would hold a small .357 Magnum revolver.

When Chuck was arrested the day after the killing, his hands were swabbed for gunshot residue (GSR) analysis, and the white tank top he was wearing was also taken for GSR analysis. No particles of GSR were found on Chuck's hands, but one particle characteristic of GSR and many particles consistent with GSR were on the tank top. [Footnote omitted.]

Sheriff's deputies seized a red Dodge Ram 1500 truck found at the residence of Mike's mother, Mary Titlow, in Butte County in late August 2009. The truck was registered to Mary and Ernest Titlow, but receipts with Mike's name and Chuck's name were found inside the truck. Many particles consistent with GSR were found on the truck's headliner.

Phone records for Chuck's cell phone showed that, on August 19, 2009, he called Horn shortly before 4:00 p.m., he called Stonebraker at 4:08 p.m., and he called Mike and Milhollin multiple times between 4:00 p.m. and 5:00 p.m. Mike's cell phone records showed he called Chuck at 4:11 p.m. Between 5:45 p.m. and 11:00 p.m., there were eight calls between Mike and Chuck.

**Defense**

Mike called Javari Jackson, who was riding in his father's truck as they drove south on San Pablo Avenue around the time of the shooting. He noticed two young Black men walking, and then saw a

dark gray truck pull up on the sidewalk with its tires screeching. The two Black men ran in opposite directions. One man ran south toward Richmond. The driver of the gray truck, who appeared to be White or Mexican, chased him. A light colored Honda was driving north on San Pablo. The Black man ran around the driver's side of the Honda toward the middle of the road, and the man chasing him ran on the other side of the car. The two men met in the middle of the road. The Black man turned around, "squaring up ready to fight," and the White man swung. It appeared the Black man got knocked out because he fell to the ground face first. Jackson watched the men from the time the truck screeched to a stop at the sidewalk, and he did not see a red truck pull up to the two men while they were fighting.

Mary Titlow testified that she owned a maroon Dodge Ram truck, which Mike borrowed in March or April of 2009 and returned after four or five months. Mary took her husband target shooting in the truck in November 2008. At that time, he was terminally ill and could not get out of the truck. She set up targets for him, and he sat in the passenger seat and shot his rifle out the window. He died in January 2009. Mary never saw Chuck with a gun.

Jessica Johnston testified as a character witness for Chuck. He was her boyfriend in the summer of 2009. They had an on-again, off-again relationship for about four or five years. Johnston never saw Chuck with a gun and he never spoke enthusiastically about guns. He was loyal to his friends.

Chuck also played excerpts of taped interviews of Horn, Tormey, and Nazari.

*People v. Titlow*, No. A138713, 2016 WL 5121799 (Cal. Ct. App. Sept. 21, 2016) (*People v. Titlow*).

Following the jury trial in Contra Costa County Superior Court in 2013, Mike Titlow was convicted of second degree murder and was found to have personally used a firearm causing great bodily injury and death. *See* Cal. Penal Code §§ 187, 12022.53. He was sentenced to a total of 40 years to life in prison, comprised of 15 years to life for the murder plus a consecutive 25 years to life for the firearm enhancement. (His son, Chuck Titlow, was convicted of voluntary manslaughter and being an accessory after the fact, for which he received a prison sentence of 6 years, 8 months.)

Mike Titlow appealed. The California Court of Appeal affirmed his conviction and the California Supreme Court denied his petition for review.

Mike Titlow then filed this action to obtain a federal writ of habeas corpus. He alleges the following claims in his federal petition: (1) the admission of evidence of statements made by

Chuck Titlow to other persons about the shooting violated Mike Titlow's rights to due process and confront witnesses under the Fifth, Sixth, and Fourteenth Amendments; (2) the admission of Mr. Horn's statement that Chuck Titlow said that Mike Titlow had a "plan" to shoot the victim violated Mike Titlow's right to due process; (3) the prosecutor's misconduct during closing argument violated Mike Titlow's right to due process; and (4) the cumulative effect of the trial errors prejudiced Mike Titlow.

Respondent has filed an answer. Mike Titlow has filed a traverse. The matter is now ready for decision.

### III.     JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this action for a writ of habeas corpus under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the petition concerns the conviction and sentence of a person convicted in Contra Costa County, California, which is within this judicial district. 28 U.S.C. §§ 84, 2241(d).

### IV.     STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review. A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'" *Id.* at 409.

The state-court decision to which § 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991). "When there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst*, 501 U.S. at 803. When confronted with an unexplained decision from the last state court to have been presented with the issue, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The presumption that a later summary denial rests on the same reasoning as the earlier reasoned decision is a rebuttable presumption and can be overcome by strong evidence. *Kernan v. Hinojosa*, 136 S. Ct. 1603, 1605-06 (2016).

Section 2254(d) generally applies to unexplained as well as reasoned decisions. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011). When the state court has denied a federal constitutional claim on the merits without explanation, and there is no lower state court decision to "look through" to, the federal habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme

13

1  Court." *Id.* at 102.

2  **V.      DISCUSSION**

3  A.      Admission of Evidence of Chuck Titlow's Statements To Third Parties

4          1.      Trial Court Proceedings

5      Mike Titlow contends that his constitutional rights were violated when the trial court

6  admitted evidence that Chuck Titlow had made statements inculpating Mike Titlow to several

7  witnesses. The statements at issue were made by Chuck Titlow at a gathering in Mr. Nazari's

8  garage the evening of the shooting. Docket No. 1 at 46.

9          The statements were: [(1)] that Chuck described his fight with
           Colina and said that Mike had driven up so close during the fight
10         that he almost hit Chuck and Colina; [(2)] that Chuck demonstrated
           to Millhollin how Mike has fired the gun across his body and said
11         that Mike had thrown the gun off a bridge; [(3)] that Chuck told his
           friends not to talk about the shooting; [(4)] that Chuck told Kellen
12         how Mike had pulled up in the truck almost hitting Chuck and
           Colina and how Mike fired the gun while reaching across his body;
13         [(5)] that Chuck told Kellen that Mike was going to bring a gun in
           case Colina had a gun; [(6)] that Chuck told Kellen how Mike said
14         he planned to shoot Colina; and [(7)] that Chuck implicated Mike in
           the murder.
15

16      The trial court rejected the defense motion to exclude these statements as inadmissible

17  hearsay, ruling instead that they were declarations against interest admissible under California

18  Evidence Code section 1230.[2] The trial court explained that the evidence allowed a reasonable

19  inference that Chuck Titlow had informed his father he intended to fight and believed that Mr.

20  Colina had a gun, and allowed a reasonable inference that Chuck Titlow was aware his father had

21  access to a gun. It was against Chuck Titlow's "penal interest in describing his father's conduct as

22  well as his own in setting up these circumstances and engaging in the fight. It did expose and does

23  expose Chuck to very significant culpability." RT 1271. The trial court also found that the

24

25  _____

26  [2] California Evidence Code section 1230 provides: "Evidence of a statement by a declarant
    having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the
27  declarant is unavailable as a witness and the statement, when made, was so far contrary to the
    declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal
28  liability, or so far tended to render invalid a claim by him against another, or created such a risk of
    making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable
    man in his position would not have made the statement unless he believed it to be true."

statements were against Chuck Titlow's "familial interest" and subjected him to social approbation and damaging the family ties with his father. RT 1272. The trial court further found that Chuck Titlow's statements were highly reliable based on these circumstances: (a) he was speaking to his "closest friends, the people he invited to back him up in this fight"; (b) he did "not have a motive to falsely implicate his father and lift blame from himself" because the people to whom the statements were made were not aligned with law enforcement; and (c) he did not have a motive to "falsely implicate his father in the shooting" because the Titlow family was close. RT 1271.

2.      State Appellate Court Decision

On appeal, Mike Titlow argued that the admission of the statements made by Chuck Titlow violated his rights under the Confrontation Clause and the Due Process Clause of the U.S. Constitution, as well as his state law rights. He argued on appeal (as he does here) that, notwithstanding the major change in Confrontation Clause analysis worked by *Crawford v. Washington*, 541 U.S. 36 (2004), older Confrontation Clause cases and other general Due Process Clause cases from the U.S. Supreme Court support the view that the admission of a nontestifying codefendant's statement is unconstitutional. *See* Docket No. 1 at 44, 54-60.

The California Court of Appeal rejected the argument that Mike Titlow's federal constitutional rights were violated by the admission of the six statements by Chuck Titlow.

> "[I]n *Ohio v. Roberts* (1980) 448 U.S. 56, 66, [*Roberts*] [the Unite[d] States Supreme Court] construed the federal Constitution's confrontation right as allowing the use at trial of any out-of-court statements that were within a 'firmly rooted hearsay exception' or had 'particularized guarantees of trustworthiness.' But some 25 years later, in *Crawford [v. Washington* (2004) 541 U.S. 36 (*Crawford*) ], the high court abandoned that approach and adopted this general rule: The prosecution may not use '[t]estimonial statements' of a witness who does not appear at trial, unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination." (*People v. Dungo* (2012) 55 Cal.4th 608, 616.)
>
> Mike concedes the admission of evidence of Chuck's statements to his friends did not violate his Sixth Amendment right to confront witnesses because the statements were not testimonial. Despite this concession, he argues admitting this evidence violated his constitutional right to due process because Chuck's statements were "unreliable" and lacked "sufficiently particularized guarantees of trustworthiness." Mike relies on *Lilly v. Virginia* (1999) 527 U.S. 116, 139 (*Lilly*), in which the United States Supreme Court

concluded an accomplice's statement inculpating another was not so reliable that there was no need for cross-examination under the confrontation clause. But *Lilly* predated *Crawford*, and the *Lilly* court applied the now-rejected reliability test set forth in *Roberts*.[3] (*Lilly, supra*, 527 U.S. at pp. 135–139.) "*Roberts, supra*, 448 U.S. 56, and its progeny are overruled for all purposes. . . . Thus, there is no basis for an inference that, even if a hearsay statement is nontestimonial, it must nonetheless undergo a *Roberts* analysis before it may be admitted under the Constitution." (*People v. Cage* (2007) 40 Cal.4th 965, 981, fn. 10, italics added.) Accordingly, *Lilly* has no bearing on whether the admission of Chuck's nontestimonial hearsay statements was constitutional. (*Ibid.; see United States v. Smalls* (10th Cir. 2010) 605 F.3d 765, 773 ["*Roberts* [is] no longer good law ... , rendering *Lilly* a dead letter"].)

[Footnote 3:] Under the prior rule, *any* hearsay statement (testimonial or not) made by an unavailable declarant was admissible only if it bore adequate "'indicia of reliability.'" (*Roberts, supra*, 448 U.S. at p. 66.)

Mike argues *Lilly* establishes that the admission of evidence of Chuck's hearsay statements violated his constitutional right to reliable evidence under the due process clause. But *Lilly* was decided based on the confrontation clause. Even when it was good law, it had no relevance to due process analysis. Essentially, Mike's argument is that the *Roberts* reliability test (as applied in *Lilly*) survives *Crawford* through the due process clause. But *Crawford* overruled *Roberts* in part because "[r]eliability is an amorphous, if not entirely subjective, concept" and because the *Roberts* reliability test was "so unpredictable." (*Crawford, supra*, 541 U.S. at p. 63.) Justice Kennedy later observed that *Crawford* rejected the *Roberts* reliability test "to delink the intricacies of hearsay law from a constitutional mandate" and "to allow the States, in their own courts and legislatures and without this Court's supervision, to explore and develop sensible, specific evidentiary rules pertaining to the admissibility of certain statements." (*Bullcoming v. New Mexico* (2011) 564 U.S. 647, 681, (dis. opn. of Kennedy, J.) Given this history, we see no basis to conclude the *Roberts* reliability test nonetheless survives as a constitutional standard governing the admissibility of nontestimonial hearsay statements with its source as the due process clause instead of the confrontation clause. (*Ibid.*; see Simons, Cal. Evidence Manual (2016 ed.), § 2:113, p. 205 ["There is no reason to believe that the *Roberts* reliability test will be resurrected through the Due Process Clause."].)

*People v. Titlow*, 2016 WL 5121799, at *10-11. The California Court of Appeal also rejected

Mike Titlow's state law challenge to the admission of the evidence under California Evidence

Code section 1230. *People v. Titlow*, 2016 WL 5121799, at *11-14.

As the last reasoned decision from a state court, the California Court of Appeal's decision

is the decision to which § 2254(d) is applied. *See Wilson*, 138 S. Ct. at 1192. Mike Titlow is

16

1  entitled to habeas relief only if the California Court of Appeal's decision was contrary to, or an

2  unreasonable application of, clearly established federal law from the U.S. Supreme Court, or was

3  based on an unreasonable determination of the facts in light of the evidence presented.

4      3.    Analysis of Federal Constitutional Claims

5      Mike Titlow urges that the admission of Chuck Titlow's statements violated his rights

6  under the Sixth Amendment's Confrontation Clause and the Fourteenth Amendment's Due

7  Process Clause.[3]  Although he asserts a Confrontation Clause claim, he concedes that current law

8  precludes relief under the Confrontation Clause and urges instead that principles from old

9  Confrontation Clause cases now support relief under the Due Process Clause.[4]

10     About fifteen years ago, the Supreme Court's decision in *Crawford v. Washington*, 541

11  U.S. 36 (2004), dramatically changed Confrontation Clause jurisprudence, and abandoned the

12  analytic framework from *Ohio v. Roberts*, 448 U.S. 56 (1980), that had been used for many years.

13  Mike Titlow's habeas petition contends that *Crawford* left the *Roberts* test intact as a test for

14  whether a due process violation had occurred and that, applying the *Roberts* test, a due process

15  violation occurred when certain nontestimonial hearsay was admitted at his trial.  His

16  Confrontation Clause argument fails because the Supreme Court has determined that *Crawford* did

17  not leave the *Roberts* test intact; instead, the rule now is that the Confrontation Clause simply does

18  _____

19  [3] Mike Titlow also argues that the evidence violated his rights under the Fifth Amendment's Due
   Process Clause, and lumps together his Fifth and Fourteenth Amendment due process arguments.
20  The Fifth Amendment argument is a nonstarter because the Fifth Amendment's Due Process
   Clause applies to federal action rather than state action.  *See generally United States v. Navarro*,
21  800 F.3d 1104, 1112 n.6 (9th Cir. 2015) (U.S. Sentencing Commission's guidelines are governed
   by Fifth Amendment's Due Process Clause, rather than Fourteenth Amendment, because it is a
   federal actor and not a state actor); *Zutz v. Nelson*, 601 F.3d 842, 849 n.4 (8th Cir. 2010) (Fifth
22  Amendment claim against local water board actors fails because the "'Fifth Amendment's Due
   Process Clause applies only to the federal government or federal actions").  Mike Titlow's due
23  process claim must be brought under the Fourteenth Amendment because it is the Fourteenth
   Amendment's Due Process Clause that applies to state action, such as his state court trial.
24

25  [4] Although Mike Titlow captioned his claim as a claim for a violation of his Fifth, Sixth, and
   Fourteenth Amendment rights, *see* Docket No. 1 at 43, he stated in the text of his petition that his
26  "Confrontation Clause rights are not implicated by Chuck's statements made in Nazari's garage"
   because "Chuck's statements are not testimonial" under *Crawford* and *Davis*.  Docket No. 1 at 57.
27  Nonetheless, the Court must do a Confrontation Clause analysis because Mike Titlow asserts a
   Confrontation Clause claim in the heading in his petition, even though most of his Confrontation
28  Clause discussion is a means to the end of using Confrontation Clause authorities to make a Due
   Process Clause argument.

17

not apply to nontestimonial evidence. His Due Process Clause argument fails because the Supreme Court has not issued a holding that the Due Process Clause requires that the *Roberts* test or any test for establishing reliability must be satisfied for hearsay evidence to be admissible at trial. The analysis is explained in more detail below.

a.  Confrontation Clause Claim

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with witnesses against him." U.S. Const. amend. VI. The ultimate goal of the Confrontation Clause "is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford*, 541 U.S. at 61.

The Confrontation Clause applies to all "testimonial" statements. *See Crawford*, 541 U.S. at 50–51. "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* at 51 (internal quotation marks and brackets omitted); *id.* at 68 ("[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations"). The "primary purpose" test establishes the boundaries of testimonial evidence. Statements are testimonial: (1) "when they result from questioning, 'the primary purpose of [which was] to establish or prove past events potentially relevant to later criminal prosecution,' *Davis v. Washington*, 547 U.S. 813, 822 (2006)," and (2) "when written statements are 'functionally identical to live, in-court testimony,' 'made for the purpose of establishing or proving some fact' at trial, *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310-11 (2009)." *Lucero v. Holland*, 902 F.3d 979, 989 (9th Cir. 2018) (alteration in original) (citing *Ohio v. Clark*, 135 S. Ct. 2173, 2179 (2015)). *See, e.g., Davis v. Washington*, 547 U.S. 813, 826-28 (2006) (victim's frantic statements to a 911 operator naming the assailant who had just hurt her were not testimonial); *id.* at 829–30 (victim's statements to officer telling him what had happened were testimonial, as there was no emergency in progress and were made after officer had separated victim and assailant); *Crawford,* 541 U.S. at 39–40, 68 (statements were testimonial where made by witness at police station to a series of questions posed

18

1    by an officer who had given *Miranda* warnings to witness and was taping and making notes of the

2    answers).

3          Before *Crawford* was decided, the Confrontation Clause analysis had been governed by the

4    "indicia of reliability" test set out in *Ohio v. Roberts*, 448 U.S. 56, 65–66 (1980). Under the

5    *Roberts* test, hearsay statements could be introduced only if the witness was unavailable at trial

6    and the statements had "adequate indicia of reliability," i.e., the statements fell within a "firmly

7    rooted hearsay exception" or bore "particularized guarantees of trustworthiness." *Roberts*, 448

8    U.S. at 66. *Roberts* was overruled in *Crawford*, although some readers of the *Crawford* opinion

9    believed that *Roberts* was not overruled as to nontestimonial statements. Two years later, the

10   Supreme Court clarified in *Davis v. Washington*, 547 U.S. 813, 821 (2006), that the *Roberts* test

11   had no continuing validity. Nontestimonial hearsay, "while subject to traditional limitations upon

12   hearsay evidence, is not subject to the Confrontation Clause." *Davis*, 547 U.S. at 821; *see also*

13   *Whorton v. Bockting*, 549 U.S. 406, 420 (2007) (referring to "*Crawford's* elimination of

14   Confrontation Clause protection against the admission of unreliable out-of-court nontestimonial

15   statements"); *United States v. Larson*, 495 F.3d 1094, 1099 n.4 (9th Cir. 2007) (en banc) (*Roberts*

16   test no longer survives and nontestimonial statements are now outside the scope of the protection

17   of the Confrontation Clause).

18         The California Court of Appeal's rejection of Mike Titlow's Confrontation Clause claim

19   was not an unreasonable application of *Crawford*, *Davis*, and *Bockting*. Mike Titlow does not

20   contend that the statements of Chuck Titlow to friends and acquaintances in the garage were

21   testimonial; indeed, he concedes that "Chuck's statements are not testimonial." Docket No. 1 at

22   57. These statements made to friends and acquaintances at a social gathering were just the sort of

23   communications that courts have repeatedly held to be nontestimonial and therefore outside the

24   protection of the Confrontation Clause. *See, e.g., Lucero*, 902 F.3d at 989 (secret note written from

25   prisoner to prisoner "was not 'testimonial' under any plausible understanding of that term"

26   because it was not functionally identical to live in-court testimony and did not have the primary

27   purpose of assisting in the defendant's prosecution); *Desai v. Booker*, 732 F.3d 628, 630 (6th Cir.

28   2013) ("the Confrontation Clause no longer applied to nontestimonial hearsay such as the friend-

to-friend confession"); *United States v. DeLeon*, 678 F.3d 317, 321–24 (4th Cir. 2012), *judgment vacated on other grounds*, 570 U.S. 913 (2013) (admission of evidence of stepson's statements describing his defendant-stepfather's disciplinary methods to social worker made several months before the stepson died did not implicate the Confrontation Clause because they were made for purposes of formulating a family treatment plan and were not testimonial); *United States v. Berrios*, 676 F.3d 118, 127–28 (3d Cir. 2012) (admission of evidence of surreptitiously recorded jailhouse conversations between codefendants did not violate the Confrontation Clause because they were not testimonial). Given that Chuck Titlow's statements to friends and acquaintances in the garage were nontestimonial statements, the Confrontation Clause did not offer any protection against their admission under current Supreme Court precedent. The Supreme Court's *Crawford*, *Davis* and *Bockting* decisions have clearly established that the *Roberts* reliability test to determine whether the Confrontation Clause is violated no longer applies and that nontestimonial hearsay evidence is not covered by the Confrontation Clause.

Mike Titlow also appears to urge that *Bruton v. United States*, 391 U.S. 123 (1968), limits the admissibility of Chuck Titlow's statements to friends and acquaintances in the garage. The *Bruton* rule is a specialized rule that provides Confrontation Clause protection against the admission of a "facially incriminating confession of a nontestifying codefendant" at a joint trial, "even if the jury is instructed to consider the confession only against the codefendant." *Richardson v. Marsh*, 481 U.S. 200, 207 (1987). The *Bruton* rule provides no help to Mike Titlow, however, because it only applies to testimonial statements, as the Ninth Circuit recently held in *Lucero*, 902 F.3d at 987-88. "[T]he *Bruton* limitation on the introduction of codefendants' out-of-court statements is necessarily subject to *Crawford*'s holding that the Confrontation Clause is concerned only with testimonial out-of-court statements." *Lucero*, 902 F.3d at 987-88. Because Chuck Titlow's statements to his friends and acquaintances at the gathering in the garage were nontestimonial, the *Bruton* rule does not apply to those statements.

Mike Titlow relies heavily on the Confrontation Clause case of *Lilly v. Virginia*, 527 U.S. 116 (1999), although he relies on it for a due process argument rather than a Confrontation Clause argument. In any event, *Lilly* does not help him in the Confrontation Clause context. *Lilly* held

that accomplice confessions implicating a defendant on trial are presumptively unreliable. 527

U.S. at 131. *Lilly*'s discussion about unreliability of accomplice statements is an application of the

*Ohio v. Roberts* test that considered the indicia of reliability of the evidence to be key to its

admissibility under the Confrontation Clause, but *Crawford* has abandoned that approach. *Jones*

*v. Premo*, 513 F. App'x 648 (9th Cir. 2013). *Crawford* did not actually overrule *Lilly*, but the

factual difference between *Lilly* and Mike Titlow's case means that *Lilly* does not apply here.

Specifically, the evidence at issue in *Lilly* was a confession made during police interrogation, *see*

*Lilly*, 527 U.S. at 120–21, and therefore was testimonial hearsay of just the sort that *Crawford*

determined was covered by the Confrontation Clause. *Crawford* recognized that very point in its

reference to *Lilly*, as *Crawford* noted that even where its recent cases (including *Lilly*) had

followed the reasoning of *Roberts,* those cases made a distinction for testimonial hearsay, and

testimonial hearsay required unavailability and prior cross-examination. *See Crawford*, 541 U.S. at

58 (*Lilly* "excluded testimonial statements that the defendant had had no opportunity to test by

cross-examination"); *see also Davis*, 547 U.S. at 825. Thus, the fact that the Supreme Court did

not overrule *Lilly* (which concerned testimonial hearsay) does not provide any support for the

argument that the *Roberts* test survives or that the Confrontation Clause continues to apply to

nontestimonial hearsay. Mike Titlow sees his case and *Lilly* as similar because both involved

confession-type statements by accomplices, but the critical difference in this post-*Crawford* era is

that the statement in Mike Titlow's case was to friends and acquaintances in a social gathering

(and, therefore, nontestimonial) whereas the *Lilly* confession was during police interrogation (and,

therefore, testimonial). *See generally United States v. Smalls*, 605 F.3d 765, 773 (10th Cir. 2010)

(district court erred in applying *Roberts* test to accomplice's statement to confidential informant

because it was nontestimonial; "*Roberts* was no longer good law when the district court made its

decision in this case, rendering *Lilly* a dead letter and eviscerating not only the presumption of

unreliability, but the entire foundation upon which the district court's order rested").

In sum, the statements made by Chuck Titlow to friends and acquaintances at the gathering

in the garage were nontestimonial and their admission did not implicate, let alone violate, the

Confrontation Clause. The California Court of Appeal's rejection of the Confrontation Clause

claim was not an unreasonable application of, or contrary to, clearly established law from the U.S. Supreme Court.

b.   Due Process Clause Claim

Mike Titlow argues that the admission of those same statements made by Chuck Titlow to the friends and acquaintances in the garage violated his rights under the Fourteenth Amendment's Due Process Clause.  He relies on Supreme Court cases that are legally and factually inapposite. Mike Titlow's due process analysis fails largely due to the limitations placed on federal habeas relief by the AEDPA.

i.   AEDPA Limits Novel Analysis and Extension of Precedent

As mentioned earlier, federal habeas relief is barred in a case governed by the AEDPA unless the state court's rejection of a claim was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  The phrase "clearly established law" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412 (2000).

A holding under one constitutional provision does not equate to a holding under another constitutional provision. *See Premo v. Moore*, 562 U.S. 115, 127-28 (2011).  In *Premo*, the Ninth Circuit had granted relief on a claim that petitioner's Sixth Amendment right to effective assistance of counsel was violated when counsel failed to move to suppress a confession before advising him to plead guilty. *Id.* at 119-20.  The Ninth Circuit found the state court's rejection of the claim to be an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984), the essential ineffective-assistance case, and contrary to *Arizona v. Fulminante*, 499 U.S. 279 (1991), a case regarding the admission of allegedly coerced confessions. *See Premo*, 562 U.S. at 120. The Supreme Court determined that the Ninth Circuit had erred in finding the state court's rejection of the ineffective-assistance claim to be contrary to *Fulminante* because *Fulminante* "says nothing about the *Strickland* standard of effectiveness." *Premo*, 562 U.S. at 128.  In holding that the rejection of an ineffective-assistance claim was contrary to *Fulminante*, the Ninth Circuit had "transposed that case into a novel context; and novelty alone—at least insofar as it renders the

22

relevant rule less than 'clearly established'—provides a reason to reject it under AEDPA." *Premo*, 562 U.S. at 127; *see, e.g., Littlejohn v. Trammell*, 704 F.3d 817, 849-50 (10th Cir. 2013) (Supreme Court holding that defendant's testimony at first trial given only because his illegally obtained confessions had been admitted in violation of his Fifth Amendment rights had to be excluded as fruit of the poisonous tree could not be extended to the novel context of a defendant who felt personally compelled to testify to give his side of story after evidence of his voluntary confession to a private actor properly was admitted).

A state court's failure to extend a Supreme Court rule to a new context does not support relief under § 2254(d)(1). "Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably *applies* this Court's precedent; it does not require state courts to *extend* that precedent or license federal courts to treat the failure to do so as error." *White v. Woodall*, 572 U.S. 415, 426 (2014) (in capital case, not objectively unreasonable for state court not to extend to the penalty phase a constitutional rule that applies to guilt phase).

ii.     Analysis of Due Process Claim

Mike Titlow argues that various cases support relief under the Due Process Clause for the admission of Chuck Titlow's statements to friends and acquaintances. He relies heavily on *Lilly v. Virginia*, 527 U.S. 116, for his argument that unreliable evidence, such as declarations against penal interest that lack sufficient guarantees of trustworthiness, violate the defendant's constitutional right to due process. Docket No. 1 at 54-60. But *Lilly* is a Confrontation Clause case (as discussed earlier in this order), and does not even mention the Due Process Clause. *See Lilly*, 527 U.S. at 120 ("The question presented in this case is whether the accused's Sixth Amendment right 'to be confronted with the witnesses against him' was violated by admitting into evidence at his trial a nontestifying accomplice's entire confession that contained some statements against the accomplice's penal interest and others that inculpated the accused."); *id.* at 139 ("The admission of the untested confession of [the nontestifying accomplice] violated petitioner's Confrontation Clause rights."). The California Court of Appeal's failure to extend *Lilly* to the due process context does not support relief under § 2254(d)(1). AEDPA "does not require state courts to *extend* [Supreme Court] precedent." *White*, 572 U.S. at 426; *Premo*, 562 U.S. at 127 (using a

case in a novel context "renders the relevant rule less than 'clearly established'" and provides a reason to reject it under AEDPA).

Mike Titlow cites *Bruton,* 391 U.S. at 130-32, to argue that "the admission of a non-testifying codefendant's statement with a limiting instruction . . . violates the defendant's due process rights." Docket No. 1 at 44. But *Bruton*'s holding rested only on the Confrontation Clause and not on the Due Process Clause. *See Bruton*, 391 U.S. at 126 ("We hold that, because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining petitioner's guilt, admission of [codefendant's] confession in this joint trial violated petitioner's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment."). The California Court of Appeal did not run afoul of § 2254(d)(1) by failing to extend *Bruton* to the due process context. *See White*, 572 U.S. at 426; *Premo*, 562 U.S. at 127.

Another case cited by Mike Titlow, *Michigan v. Bryant*, 562 U.S. 344 (2011), held that the wounded victim's statements made to police to meet an ongoing emergency "were not testimonial and that their admission at [defendant's] trial did not violate the Confrontation Clause." *Id.* at 378. The case did not have any holding based on the Due Process Clause. As with *Lilly* and *Bruton*, the California Court of Appeal did not run afoul of § 2254(d)(1) by failing to extend *Bryant* to the due process context. *See White*, 572 U.S. at 426; *Premo*, 562 U.S. at 127. *Bryant* did mention the Due Process Clause in a footnote: "Of course the Confrontation Clause is not the only bar to admissibility of hearsay statements at trial. State and federal rules of evidence prohibit the introduction of hearsay, subject to exceptions. Consistent with those rules, the Due Process Clauses of the Fifth and Fourteenth Amendments may constitute a further bar to admission of, for example, unreliable evidence." *Id.* at 370 n.13. This footnote which leaves open and ill-defined possible Due Process claims is not the holding of the case, however, and therefore is not "clearly established law" for purposes of § 2254(d)(1). *See Williams*, 529 U.S. at 412.

Another case cited by Mike Titlow at least has a holding resting on the Due Process Clause, but it still does not help him because it addressed a factually distinct issue. The case of *Manson v. Brathwaite*, 432 U.S. 98 (1977), "present[ed] the issue as to whether the Due Process

Clause of the Fourteenth Amendment compels the exclusion, in a state criminal trial, apart from any consideration of reliability, of pretrial identification evidence obtained by a police procedure that was both suggestive and unnecessary." *Id.* at 99. The Supreme Court "conclude[d] that reliability is the linchpin in determining the admissibility of identification testimony," and the factors to be considered in evaluating reliability include the "opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself." *Id.* at 114. *Manson* concerned a particular kind of evidence (i.e., evidence derived from pretrial showups and pretrial lineups), and did not announce any general reliability requirement for all evidence. That *Manson* is specific to lineups and showups is evident from the factors identified by the Court for evaluating such reliability -- e.g., the witness' opportunity to view the criminal, the witness' descriptions of the criminal, and the witness' level of certainty in the identification – which do not make sense outside the context of witness identification procedures. *Manson* did not purport to establish a Due Process test of reliability more generally outside the context of the lineup. Hence, the California Court of Appeal did not run afoul of § 2254(d)(1) by not extending *Manson* to the very different context of the admission of hearsay statements. *See White*, 572 U.S. at 426; *Premo*, 562 U.S. at 127.

The last two cases cited by Mike Titlow also had due process holdings, but concern the trial court's exclusion of evidence rather than the admission of evidence: *Green v. Georgia*, 442 U.S. 95 (1979), and *Chambers v. Mississippi*, 410 U.S. 284 (1973). In *Green*, the Court held that, regardless of whether the proffered testimony of a third party who would testify that a second defendant confided that he killed the victim came within the State's hearsay rule, the exclusion of that testimony violated the Due Process Clause because it was highly relevant to a critical issue in the punishment phase and substantial reasons existed to assume its reliability. 442 U.S. at 97. In *Chambers*, the Court held that refusal to allow a defendant to cross-examine a witness plus the exclusion of evidence showing a third party confessed under circumstances which bore substantial assurances of trustworthiness "denied him a trial in accord with traditional and fundamental

United States District Court
Northern District of California

1   standards of due process." 410 U.S. at 302. Neither of these cases which addressed the

2   constitutionality of *excluding* certain evidence contained a holding about the constitutionality of

3   *admitting* evidence. The California Court of Appeal's failure to extend and apply these two cases

4   to the admission of Chuck Titlow's statements does not support relief under § 2254(d)(1). *See*

5   *White*, 572 U.S. at 426; *Premo*, 562 U.S. at 127.

6       Because none of the cases cited by Mike Titlow provide the answer to his due process

7   issue, the admissibility of Chuck Titlow's statements is analyzed under more general Supreme

8   Court cases that do apply to the admission of evidence.

9       The United States Supreme Court has never held that the introduction of propensity or

10  other allegedly prejudicial evidence violates due process. *See Estelle v. McGuire*, 502 U.S. 62,

11  68-70 (1991); *id.* at 75 n.5 ("we express no opinion on whether a state law would violate the Due

12  Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a

13  charged crime").

14      In *Estelle v. McGuire*, the defendant was on trial for the murder of his infant daughter after

15  she was brought to a hospital and died from numerous injuries suggestive of recent child abuse.

16  Defendant told police the injuries were accidental. Evidence was admitted at trial that the coroner

17  discovered during the autopsy older partially healed injuries that had occurred six to seven weeks

18  before the child's death. *Id.* at 65. Evidence of the older injuries was introduced to prove

19  "battered child syndrome," which "exists when a child has sustained repeated and/or serious

20  injuries by nonaccidental means." *Id.* at 66. The state appellate court had held that the proof of

21  prior injuries tending to establish battered child syndrome was proper under California law. *Id.* In

22  federal habeas proceedings, the Ninth Circuit found a due process violation based in part on its

23  determination that the evidence was improperly admitted under state law. *Id.* at 66-67. The U.S.

24  Supreme Court first held that the Ninth Circuit had erred in inquiring whether the evidence was

25  properly admitted under state law because "'federal habeas corpus relief does not lie for errors of

26  state law.'" *Id.* at 67. The Supreme Court then explained:

27          The evidence of battered child syndrome was relevant to show
            intent, and nothing in the Due Process Clause of the Fourteenth
28          Amendment requires the State to refrain from introducing relevant

evidence simply because the defense chooses not to contest the point.  [¶]  Concluding, as we do, that the prior injury evidence was relevant to an issue in the case, we need not explore further the apparent assumption of the Court of Appeals that it is a violation of the due process guaranteed by the Fourteenth Amendment for evidence that is not relevant to be received in a criminal trial.  We hold that McGuire's due process rights were not violated by the admission of the evidence.  *See Spencer v. Texas*, 385 U.S. 554, 563–564, 87 S. Ct. 648, 653–654, 17 L.Ed.2d 606 (1967) ("Cases in this Court have long proceeded on the premise that the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial . . . .  But it has never been thought that such cases establish this Court as a rulemaking organ for the promulgation of state rules of criminal procedure").

*Estelle v. McGuire*, 502 U.S. at 70 (omission in original).

The cited case, *Spencer v. Texas*, 385 U.S. at 563, held that the admission of evidence of prior convictions did not violate due process.  The Supreme Court explained in *Spencer* that, although there may have been other, perhaps better, ways to adjudicate the existence of prior convictions (e.g., a separate trial on the priors after the trial on the current substantive offense resulted in a guilty verdict), Texas' use of prior crimes evidence in a "one-stage recidivist trial" did not violate due process.  *Id.* at 563-64.  "In the face of the legitimate state purpose and the long-standing and widespread use that attend the procedure under attack here, we find it impossible to say that because of the possibility of some collateral prejudice the Texas procedure is rendered unconstitutional under the Due Process Clause as it has been interpreted and applied in our past cases."  *Id.* at 564.

*Estelle v. McGuire* also cited to *Lisenba v. California*, 314 U.S. 219, 228 (1941), in support of the conclusion that the introduction of the battered child syndrome evidence did not so infuse the trial with unfairness as to deny due process of law.  *See Estelle v. McGuire*, 502 U.S. at 75.  In *Lisenba*, the Supreme Court rejected a claim that the admission of inflammatory evidence violated the defendant's due process rights.  The evidence at issue in *Lisenba* was live rattlesnakes and testimony about them to show they had been used by the defendant to murder his wife.  "We do not sit to review state court action on questions of the propriety of the trial judge's action in the admission of evidence. We cannot hold, as petitioner urges, that the introduction and identification of the snakes so infused the trial with unfairness as to deny due process of law. The fact that evidence admitted as relevant by a court is shocking to the sensibilities of those in the courtroom

cannot, for that reason alone, render its reception a violation of due process." *Lisenba*, 314 U.S. at 228-29.

These three Supreme Court cases declined to hold that the admission of prejudicial evidence violates the defendant's due process rights. No Supreme Court cases since *Estelle v. McGuire* have undermined the holdings in these three cases. In other words, there is no Supreme Court holding that the admission of prejudicial evidence violates due process.

The Supreme Court has, however, established a general principle of "fundamental fairness," i.e., evidence that "is so extremely unfair that its admission violates 'fundamental conceptions of justice'" may violate due process. *Dowling v. United States*, 493 U.S. 342, 352 (1990) (quoting *United States v. Lovasco*, 431 U.S. 783, 790 (1977) (due process was not violated by admission of evidence to identify perpetrator and link him to another perpetrator even though the evidence also was related to crime of which defendant had been acquitted)). Thus, the court may consider whether the evidence was "so extremely unfair that its admission violates 'fundamental conceptions of justice.'" *Id.*

In this circuit, the admission of prejudicial evidence may make a trial fundamentally unfair and violate due process "[o]nly if there are no permissible inferences the jury may draw from the evidence." *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991). "Evidence introduced by the prosecution will often raise more than one inference, some permissible, some not; we must rely on the jury to sort them out in light of the court's instructions. Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.' Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose." *Jammal*, 926 F.2d at 920 (internal citation and footnote omitted).[5]

_____

[5] In *Jammal*, the police found a gun, $47,000 and drugs in the trunk of Jammal's stolen car when they arrested Willis, who had stolen Jammal's car; 18 months later, the police found $135,000 (but no drugs) in the trunk of Jammal's car when they arrested Jammal. At trial, Willis said he had no idea the drugs and money were in the trunk of Jammal's stolen car until police opened it. The prosecution urged the jury to infer that both the drugs and the $47,000 found in the trunk of Jammal's car when Willis was arrested belonged to Jammal since Jammal later was arrested also with a large stash of cash in his trunk. Jammal unsuccessfully objected that this evidence effectively branded him a drug dealer and was therefore inadmissible character evidence. The

28

Here, the California Court of Appeal reasonably could have determined that the admission of evidence that Chuck Titlow told other persons that Mike Titlow shot the victim did not meet the very demanding standard of being so extremely unfair that its admission violated fundamental conceptions of justice. There were permissible inferences that could be drawn from the evidence, i.e., that Mike Titlow was the person who shot the victim and that the shooting was intentional. The evidence was relevant because it aided the jury in assessing the guilt of Mike Titlow and Chuck Titlow.

"[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). Bearing in mind the extremely general nature of the Supreme Court's articulation of a principle of "fundamental fairness" – i.e., evidence that "is so extremely unfair that its admission violates 'fundamental conceptions of justice'" may violate due process, *see Dowling*, 493 U.S. at 352 – the California Court of Appeal's rejection of Mike Titlow's due process claim was not contrary to or an unreasonable application of federal law clearly established by the Supreme Court. *See generally Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (denying writ because, although Supreme Court "has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant

---

Ninth Circuit explained that state law evidence rules were beside the point in a federal habeas proceeding and any problem in the jury inferring that Jammal had put the $47,000 and drugs in the car earlier (even if impermissible under state law) was not a constitutional problem because the inference that Jammal had put both the $47,000 and drugs in the trunk on an earlier occasion was a "rational inference" the jury could draw from the evidence that he was caught with $135,000 in his trunk. *Jammal*, 926 F.2d at 920.

*Jammal* is one of the few cases that gives any guidance as to what might amount to the introduction of evidence that might amount to fundamental unfairness. The Ninth Circuit continues to use the *Jammal* "permissible inference" test in habeas cases governed by the AEDPA. *See, e.g., Noel v. Lewis*, 605 F. App'x 606, 608 (9th Cir. 2015) (admission of gang evidence did not violate due process); *Lundin v. Kernan*, 583 F. App'x 686, 687 (9th Cir. 2014) (citing *Jammal* and concluding that admission of graffiti evidence did not violate due process because there were permissible inferences to be drawn); *Gonzalez v. Knowles*, 515 F.3d 1006, 1011 (9th Cir. 2008) (citing *Jammal* and concluding that evidence of prior bad acts did not violate due process).

29

issuance of the writ."); *Alberni v. McDaniel*, 458 F.3d 860, 865 (9th Cir. 2006) (denying habeas relief on claim that due process was violated by admission of evidence of defendant's past violent actions and explosive temper to show propensity due to *Estelle v. McGuire's* reservation of the question whether propensity evidence violates due process). Mike Titlow is not entitled to the writ on this claim.

### iii. <u>State Law Violation</u>

Mike Titlow attempts to transform a state law error claim into a federal due process claim. He argues first that California's declaration against penal interest hearsay exception (Cal. Evid. Code § 1230) violates due process because California has not incorporated a presumption that accomplice hearsay is inherently unreliable "[d]espite the United States Supreme Court's finding in *Lilly* that statements against penal interest are inherently unreliable when offered against a co-defendant." Docket No. 1 at 61. *Lilly* cannot bear the weight Mike Titlow tries to thrust on it because, as explained above, *Lilly*, 527 U.S. 116, is a Confrontation Clause case and has no holding under the Due Process Clause. The Supreme Court has specifically directed that Section 2254(d)(1) "does not require state courts to *extend* [Supreme Court] precedent or license federal courts to treat the failure to do so as error." *White*, 572 U.S. at 426. It was not an unreasonable application of, or contrary to, *Lilly* for the California Court of Appeal to decline to extend that Confrontation Clause case to the very novel context of imposing a duty on states to incorporate a presumption of unreliability in accomplice hearsay as a matter of due process.

Mike Titlow also attempts to turn a state law violation into a federal due process violation by asserting that he had a due process right to have the state court follow state law. Docket No. 1 at 67. His claim rests on a general statement in *Hicks v. Oklahoma*, 447 U.S. 343 (1980), that he contends imposes a federal constitutional duty on state courts to comply with state laws. It is necessary to look at the particular problem at issue in *Hicks* to understand the limited value of that case for habeas petitioners trying to use it as the basis of a due process claim.

The Supreme Court observed in *Hicks* that a failure to follow state law might implicate the criminal defendant's federal right to due process. *Id.* at 346. In *Hicks*, Oklahoma law provided that a convicted defendant was entitled to have his punishment fixed by the jury. Hicks' jury had

been instructed, in accordance with a habitual offender statute then in effect, that the jury had to assess the punishment at 40 years' imprisonment if it found defendant guilty. *See Hicks*, 447 U.S. at 344-45. The jury followed the instruction, imposing the mandatory 40-year term when it returned a guilty verdict. *Id.* at 345. Later, the Oklahoma habitual offender statute was declared unconstitutional in a separate case, and that led Hicks to try to set aside his sentence. The state appellate court rejected Hicks' effort to have his sentence set aside, reasoning that he was not prejudiced by the impact of the unconstitutional habitual offender statute because his sentence was within the range of punishment that could have been imposed. *Id.* The U.S. Supreme Court determined that this analysis was erroneous. The Court explained that a convicted defendant was entitled under Oklahoma law to have his punishment fixed by the jury and that, without the unconstitutional statute, the jury could have imposed any sentence of not less than ten years, so it was incorrect to say that the instruction that directed a 40-year sentence did not prejudice the defendant. *Id.* at 345-46. The Court next rejected the argument that this was only a state law error: "It is argued that all that is involved in this case is the denial of a procedural right of exclusively state concern. Where, however, a State has provided for the imposition of criminal punishment in the discretion of the trial jury, it is not correct to say that the defendant's interest in the exercise of that discretion is merely a matter of a state procedural law. The defendant in such a case has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion, and that liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation by the State." *Id.* at 346 (citation omitted).

It is extremely doubtful that *Hicks* could support habeas relief for the sort of alleged error that occurred here. To do so would require extending *Hicks* from the sentencing context to the entirely different context of the admission of hearsay evidence at trial. A state court's failure to extend a Supreme Court rule to a new context does not support relief under § 2254(d)(1). *White*, 572 U.S. at 426.

Even assuming arguendo that *Hicks* provides clearly established federal law from the U.S. Supreme Court that a criminal defendant's federal right to due process rights is violated by the

state court's failure to follow state law, Mike Titlow's claim fails because the California Court of Appeal determined that there was not a failure to follow state law, i.e., it held that the statements were properly admitted under California's hearsay rule. A state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). This court is bound by the California Court of Appeal's determination that the evidence was properly admitted under California law. There was no *Hicks*-type due process violation because there was no failure to follow state law.

Ultimately, Mike Titlow's claim is just an attempt to make a state law claim into a federal one simply by labeling it a "due process" violation. That will not work because a litigant cannot "transform a state-law issue into a federal one merely by asserting a violation of due process." *See Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996). That is just what Mike Titlow has attempted to do with his claim that hearsay evidence was improperly admitted because the trial court failed to correctly apply California Evidence Code section 1230. To the extent his claim is one for state law error, it must be rejected because a state law error cannot be the basis for federal habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.").

Finally, Mike Titlow argues that the trial court made an unreasonable determination of the facts in determining that Chuck Titlow made his statements to his "closest friends," when in fact some of the people in the garage were new acquaintances. *See* Docket No. 1 at 73-74. This argument does not aid him because the alleged discrepancy does not make any difference for his federal constitutional claims. With regard to the Confrontation Clause claim, the evidence would be testimonial (and covered by the Confrontation Clause) only if the statements were made in response to "questioning, 'the primary purpose of [which was] to establish or prove past events potentially relevant to later criminal prosecution,'" or "functionally identical to live, in-court testimony,' 'made for the purpose of establishing or proving some fact' at trial." *Lucero*, 902 F.3d at 989 (alteration in original). Given the complete absence of evidence that the people in the garage were affiliated with law enforcement, it matters not whether those people were his closest

friends or merely new acquaintances because his statements were not made to police or to anyone aligned with the police and were not made to aid in the prosecution. With regard to the Due Process Clause claim, the status of the listeners does not drive the analysis of whether the admission of the evidence violated the criminal defendant's federal constitutional right to due process. With regard to the due process claim based on the alleged failure to follow state law, the California Court of Appeal found that state law was complied with because the statements were admissible in that they were made in a "noncoercive setting among friends, not an interrogation," even if the audience was not comprised of just his closest friends. *People v. Titlow*, 2016 WL 5121799, *14.

Mike Titlow is not entitled to the writ on his claims that the admission of Chuck Titlow's statements violated his right to due process.

B.     Admission of Mr. Horn's Testimony About the "Plan" To Kill Mr. Colina

Mike Titlow urges that his right to due process was violated when the trial court erroneously admitted evidence of Mr. Horn's statement that Chuck Titlow said that Mike Titlow had a "plan" to shoot Mr. Colina. Docket No. 1 at 82. Mike Titlow argues that the statements should not have been admitted "because they were hearsay statements not subject to an exception." *Id.*

The California Court of Appeal rejected his challenge to the admission of the evidence. The appellate court discussed only the state hearsay questions, and concluded that the evidence was admitted properly under the California Evidence Code  *See People v. Titlow*, 2016 WL 5121799, *15-16.

Because there is no reasoned state court decision on the federal constitutional claim, this Court "must determine what arguments or theories supported or . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the U.S. Supreme Court. *Harrington v. Richter*, 562 U.S. at 102.

In this claim, Mike Titlow again attempts to turn a state law violation into a federal due process violation by asserting that he had a due process right to have the state court follow state

33

United States District Court
Northern District of California

1    law. Docket No. 1 at 83 (citing *Hicks v. Oklahoma*, 447 U.S. 343 (1980)). This claim is rejected

2    for the same reasons that this Court rejected his similar claim about Chuck Titlow's statements

3    identifying Mike Titlow as the shooter, discussed in Section A.3.b.3, above. The reasoning will be

4    presented only briefly because it is the same as in Section A.3.b.3.

5       The Supreme Court observed in *Hicks* that a failure to follow state law might implicate the

6    criminal defendant's federal right to due process. *Id.* at 346. It is extremely doubtful that *Hicks*

7    could support habeas relief for the sort of alleged error that occurred here because doing so would

8    require extending *Hicks* from the sentencing context to the entirely different context of the

9    admission of hearsay evidence at trial. The state court's failure to *extend* a Supreme Court rule to

10    a new context does not support relief under § 2254(d)(1). *White*, 572 U.S. at 426.

11       Even assuming arguendo that *Hicks* provides clearly established federal law from the U.S.

12    Supreme Court that a criminal defendant's federal right to due process rights is violated by the

13    state court's failure to follow state law, Mike Titlow's claim fails because the California Court of

14    Appeal determined that there was not a failure to follow state law, i.e., it held that the evidence

15    properly was admitted under California's hearsay rule. A state court's interpretation of state law,

16    including one announced on direct appeal of the challenged conviction, binds a federal court

17    sitting in habeas corpus. *Bradshaw*, 546 U.S. at 76. This court is bound by the California Court

18    of Appeal's determination that the evidence was properly admitted under California law. There

19    was no *Hicks*-type due process violation because there was no failure to follow state law.

20       Finally, insofar as Mike Titlow seeks relief on the ground that there was a state law error,

21    the claim fails because federal habeas relief is not available for state law errors. *See Estelle v.*

22    *McGuire*, 502 U.S. at 67. Mike Titlow is not entitled to the writ on his claim that the admission of

23    Mr. Horn's testimony about a plan to kill Mr. Colina violated due process.

24    C.    <u>Prosecutorial Misconduct</u>

25       Mike Titlow asserts that the prosecutor engaged in misconduct by making certain

26    comments during closing argument. The California Court of Appeal rejected his prosecutorial

27    misconduct claim in a reasoned decision. (The particular errors alleged and the state appellate

28    court's analysis will be discussed in detail below.)

As the last reasoned decision from a state court, the California Court of Appeal's decision is the decision to which § 2254(d) is applied. *See Wilson*, 138 S. Ct. at 1192. Mike Titlow is entitled to habeas relief only if the California Court of Appeal's decision was contrary to, or an unreasonable application of, clearly established federal law from the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented.

The appropriate standard of review for a prosecutorial misconduct claim in a federal habeas corpus action is the narrow one of due process and not the broad exercise of supervisory power. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) ("it 'is not enough that the prosecutors' remarks were undesirable or even universally condemned'"); *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."). Under *Darden*, the inquiry is whether the prosecutor's behavior or remarks were improper and, if so, whether they infected the trial with unfairness. *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005). The "*Darden* standard is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations.'" *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (omission in original) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

1.    Prosecutor Mentions Victim's Family In The Courtroom

Mike Titlow argues that the following comment by the prosecutor was misconduct because it: (a) mentioned the victim's family in the courtroom after the trial court had ruled that the attorneys were not to mention the family, and (b) "denigrat[ed] defense counsel as insensitive toward Colina's family in the courtroom." Docket No. 1 at 88. The comment in question was the following:

> You know, both defense attorneys started their arguments saying
> that the murder of Ricardo Colina was senseless, beyond senseless.
> And then they both turned, and I frankly I do not understand this,
> and looked at the Colina family, at Ricardo's mom, his dad, his
> aunts, his uncle, and had the nerve to talk about their pain.
> Ricardo's attacked in the courtroom, accused of having a gun.
> Really? [¶]  They have to sit and watch these defense attorneys
> attack their child that they poured their heart and soul into raising --.

RT 3627.  Chuck Titlow's attorney objected that the argument appealed to the passions, prejudices

35

and sympathies of the jurors.  RT 3627.  The trial court responded that the court had "instructed the jury that sympathy and passion are not to be considered as factors in this case." *Id.*

The California Court of Appeal rejected the prosecutorial misconduct claim.  That court correctly identified the applicable federal constitutional standard:  "The applicable federal and state standards regarding prosecutorial misconduct are well established.  A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process."  *People v. Titlow*, 2016 WL 5121799, at *17 (omission in original) (internal quotation marks omitted).

The state appellate court explained that the trial court had granted a pretrial defense request to preclude the prosecutor from referring to the victim's family and friends, including those in the gallery.  *Id.* at *18.  The prosecutor did not mention the family in her closing argument, but then both defense attorneys referred to the victim's family in their closing argument, stating that the victim's death must have caused significant pain and suffering for the family.  *Id.* at 18 & n.8.  In her rebuttal argument, the prosecutor made the challenged comment quoted above.

The California Court of Appeal found there was no constitutional violation:

> "'[W]e view the prosecutor's comments in relation to the remarks of defense counsel, and inquire whether the former constitutes a fair response to the latter.'" (*People v. Pearson* (2013) 56 Cal.4th 393, 431–432.)  Given that the prosecutor's argument was a response to comments made by both defense attorneys, we cannot say her reference to Colina's family was deceptive or reprehensible.  The prosecutor's comment that the defense attorneys "had the nerve to talk about [the Colina's] pain" was extremely brief and not reprehensible or unduly inflammatory.  It would not have prejudiced the defendants especially in light of the trial court's immediate reminder that "sympathy and passion are not to be considered as factors in this case."

*Id.* at *18 (alternations in original).

The California Court of Appeal's rejection of this claim was not contrary to or an unreasonable application of clearly established federal law as set forth by the U.S. Supreme Court.  A prosecutor's comment in rebuttal "must be evaluated in light of the defense argument that preceded it."  *Darden*, 477 U.S. at 179.  "Criticism of defense theories and tactics is a proper

36

subject of closing argument." *United States v. Sayetsitty*, 107 F.3d 1405, 1409 (9th Cir. 1997); *cf. United States v. Frederick*, 78 F.3d 1370, 1379-80 (9th Cir. 1996) (prosecutor's back-handed compliment to defense lawyer for confusing witness, which appeared to imply that his methods were somewhat underhanded and designed to prevent truth from coming out, was improper but not alone reversible error). Here, the prosecutor's comment suggested the defense was false in its attempt to show sympathy with the victim's family when defense counsel had faced the family and made certain comments that appeared sympathetic to the victim's family. Before the prosecutor made her challenged comment, Mike Titlow's attorney had argued that he (i.e., Mike Titlow's attorney) "cannot even begin to imagine the pain, the frustration, the emotional rollercoaster that Mr. and Mrs. Colina are going through at the loss of their son" and Chuck Titlow's attorney had told the jurors that they might have an "automatic response . . . to want to bring comfort to the family, to the parents, to gratify the parents." RT 3497, 3537. The prosecutor indicated that the two defense attorneys had faced the victim's family in the gallery as they began their closing argument with their purportedly sympathetic comments, *see* RT 3627, and Mike Titlow does not disagree that the defense attorneys had turned to face the victim's family when making their comments. The fact that the prosecutor's comment contravened the court's order not to mention the family does not clearly establish a due process violation, particularly given that the comment was made in response to the efforts of defense counsel efforts to show sympathy to the victim's family in the courtroom.[6] *See Darden*, 477 U.S. at 181-82.

The California Court of Appeal reasonably determined that this comment by the prosecutor did not make the trial fundamentally unfair. The comment reasonably was viewed as a fair response to defense counsels' comments and conduct that preceded the prosecutor's comment, and the trial court promptly reminded the jurors that "sympathy and passion are not to be considered as factors in this case." It was not an unreasonable application of *Darden* for the California Court of Appeal to reject this prosecutorial misconduct claim.

---

[6] In ruling that there should not be a mention of the victim's family, the court stated: "I don't think there's any – there isn't generally a need to identify the family members in court. [¶] If there's a reason to do so, we can talk about it. I'm going [to] grant the reference [sic] to family members in court unless there's a specific need to do so." RT 1076.

2.    <u>Comment On Voluntary Manslaughter</u>

Mike Titlow argues that the prosecutor misstated the law of voluntary manslaughter in her discussion of voluntary manslaughter based on an unreasonable defense of another.

The prosecutor argued:

> It has to be imminent danger that has to be dealt with at that moment. And it has to be deadly force. It can't be an assault with fists to justify the use of a gun. [¶] So there's just absolutely no evidence in this case to support that conclusion. The only thing that's even around Ricardo Colina after he's killed is his red cell phone.

RT 3484-85.

Mike Titlow contends that this misstates the law because the "danger does not have to be deadly force, it can be imminent great bodily injury. Also, fists can create the provocation that would justify the use of deadly force." Docket No. 1 at 100-01 (citations omitted).

The California Court of Appeal rejected this claim of prosecutorial misconduct. The court found that the claim had been forfeited because counsel had failed to raise a timely objection and request an admonition." *People v. Titlow*, 2016 WL 5121799, at *20. The court also rejected Mike Titlow's effort to blame his attorney for the default created by the failure to object.

> "[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance." (*People v. Maury* (2003) 30 Cal.4th 342, 419.) Mike now argues the prosecutor misstated the law because "a blow with the fist may be sufficient to justify the use of deadly force." At trial, however, Mike's attorney may have decided that objection was unnecessary because Mike's theory of unreasonable defense of others was not based on a belief that Chuck was in imminent peril from Colina *using his fists*. Rather, the defense theory may have been that Mike shot Colina because he had an honest but unreasonable belief that Colina *was armed*.
>
> Further, any error was harmless. The jury was properly instructed on unreasonable defense of another. The court also instructed, "If anything concerning the law said by the attorneys in their arguments or any other time during the trial conflicts with my instructions on the law, you must follow my instructions." "When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former, for '[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.'" (*People v. Osband* (1996) 13 Cal.4th 622, 717.)

38

*People v. Titlow*, 2016 WL 5121799, at *20 (alterations in original).

Under the instructions given, a killing would be voluntary manslaughter rather than murder if the killing occurred "in the actual but unreasonable belief in the necessity to defend another person against imminent peril to life or great bodily injury." CT 653 (CALJIC 8.40); *see also* CT 657 (CALJIC 5.17 ("A person who kills another person in the actual but unreasonable belief in the necessity to defend his son against imminent peril to life or great bodily injury, kills unlawfully but does not harbor malice aforethought and is not guilty of murder."). The prosecutor's argument regarding voluntary manslaughter based on an unreasonable defense of another was legally incorrect because she said that only "deadly force" and not "an assault with fists" could support voluntary manslaughter. RT 3484. Under CALJIC 8.40, an assault with fists could support voluntary manslaughter if that assault with fists amounted to deadly force or if Chuck Titlow was in imminent peril of death or great bodily injury.

Here, the misstatement of law was on a point that was not critical to the defense; indeed, Mike Titlow did not even argue unreasonable defense of others in his closing argument. Instead, he tried to cast doubt that he or his truck were even present or that the gunshot wound could have been inflicted from a weapon fired from inside his truck. Mike Titlow did not argue that he shot the victim upon perceiving a threat of great bodily harm or death to Chuck Titlow. The evidence showed that Mr. Colina had only struck a blow over Chuck Titlow's eye with his fist, and had done so only after Chuck Titlow had chased him. The evidence was that Chuck Titlow was the aggressor in the fight and had summoned several friends (who were present or en route) to help him if he got into difficulty when he went to fight Mr. Colina. As the prosecutor argued, there was no shortage of muscle power available from his friends if Chuck Titlow got into trouble with the man he chased down. Chuck Titlow went to the location for the purpose of getting in a fight with Mr. Colina, and Mike Titlow had brought a gun to that location for the fight. As the prosecutor pointed out, there was nothing in the victim's hands when he was shot and the jury had "heard nothing in this case about Mike Titlow perhaps saying after the killing, 'Oh, my goodness. I thought Chuck was going to be killed and so I had to act immediately.'" RT 3484.

The prosecutor's misstatement was harmless error at most, as the California Court of

Appeal reasonably determined. "[A]rguments of counsel generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence, and are likely viewed as the statements of advocates," whereas the latter "are viewed as definitive and binding statements of the law." *Boyde v. California*, 494 U.S. 370, 384 (1990) (citation omitted). Here, the trial court instructed the jury on voluntary manslaughter, CT 653, 657, and those instructions are unchallenged. The court also instructed the jury that it "must accept and follow the law" as stated by the court; "[i]f anything concerning the law said by the attorneys in their arguments or at any other time during the trial conflicts with my instructions, you must follow my instructions." CT 586. Mike Titlow has provided no reason to depart from the normal presumption that jurors follow the court's instructions. *See Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985). He is not entitled to relief on this prosecutorial misconduct claim.

### 3. Argument About Mr. Stonebraker

Mike Titlow argues that the prosecutor committed misconduct by arguing that Mr. Stonebraker implied that Mike Titlow was the shooter.

In her closing argument, the prosecutor reviewed several witnesses' statements and urged that the Titlows had conspired to intimidate witnesses. She discussed Messrs. Petruzzelli, Nazari and Milhollin, and then turned her attention to Mr. Stonebraker. The following argument and objections took place:

> [THE PROSECUTOR:] Justin Stonebraker, who goes to – he has started to tell the truth, and when he's confronted with, "Who was out there with you guys?" he won't even say Mike Titlow's name. [¶] He goes through this elaborate detail with Detective Meth, "What's your name?" [¶] "Mike. [¶] Okay. And we're repeating Mike Meth –
>
> MS. CLARK [COUNSEL FOR MIKE TITLOW]: I'm going to object. I don't believe there's any testimony about that in the record.
>
> MS. MONT [COUNSEL FOR CHUCK TITLOW]: Join.
>
> MS. CLARK: Assumes facts not in evidence.
>
> THE COURT: I don't recall that portion of the recordings being made, do you?

[THE PROSECUTOR:]  Oh, we didn't play his interview, but he testified to his interview.

MS. CLARK:  Your Honor, I'm going to object.  I don't believe that there was any testimony or recordings played regarding this portion of Ms. Knox's closing.

MS. MONT:  I will join.

THE COURT:  Okay.  It's the jury's recollection of what the testimony was, and whether any argument by counsel is supported by the evidence that your heard.  So that will be the jury's call.

[THE PROSECUTOR:]  And writing the name Mike Titlow and then tearing up the note into little tiny pieces –

MS. CLARK:  Your Honor, my objection is continuing just for the record.

THE COURT:  Okay.

MS. MONT:  There was no evidence of this, Your Honor.

THE COURT:  Again, that's going to be for the jury to decide.

RT 3475-76.

The California Court of Appeal rejected the argument that the foregoing showed prosecutorial misconduct and found instead that it appeared to be innocent misrecollection by the prosecutor as to which witness had made the statements:

> Mike claims the prosecutor engaged in misconduct by misstating the evidence, and the trial court compounded the error by suggesting there was evidence the jury did not see that supported the prosecutor's statement.  It appears, however, that the prosecutor was simply mistaken about which witness had gone into "elaborate detail" to avoid saying Mike's name.  Milhollin's taped interview showed that, when Meth asked him who could have done it, he responded "I forgot your name," and Meth said, "Mike."  Milhollin also referred to writing it down on a piece of paper.  Under these circumstances, the prosecutor's mistaken reference to Stonebraker rather than Milhollin did not constitute deceptive or reprehensible methods, and, further, her misstatement was harmless.  As the Attorney General argues, the challenged comments did not cause unfairness because evidence showed that a witness behaved in the manner described by the prosecutor.

*People v. Titlow*, 2016 WL 5121799, at *19.

The California Court of Appeal did not unreasonably apply *Darden* in determining that this statement by the prosecutor did not render the trial fundamentally unfair.  As the state appellate

court noted, the prosecutor simply mixed up the witness to whom the evidence pertained. The prosecutor may have been wrong about which witness named Mike Titlow in the manner she described, but there was a witness who did identify him this way, i.e., by indirectly naming him and by writing his name down on a piece of paper. Giving the wrong name for this witness – i.e., saying it was Mr. Stonebraker when in fact it was Mr. Milhollin – did not cause fundamental unfairness at the trial. It was not an unreasonable application of clearly established law from the Supreme Court for the California Court of Appeal to conclude that the mistaken reference to Mr. Stonebraker rather than Mr. Milhollin did not violate due process.

4. <u>Argument About Chuck Titlow's Statement to Mr. Nazari</u>

Mike Titlow argues that the prosecutor misstated the facts when she argued that Chuck Titlow told Mr. Nazari that he (Chuck Titlow) had found the "two black guys" who pulled the gun on him. RT 3609.

The California Court of Appeal rejected the prosecutorial misconduct claim, first explaining what had transpired, and then concluding that the prosecutor had promptly corrected her misstatement.

> In rebuttal, the prosecutor argued, "Chuck Titlow told Kareem Nazari, 'The two black guys that I saw walk in Tara Hills that pulled a gun on me, I found them.' [¶] If you have any question about that, please have Kareem Nazari's interview—" Chuck's attorney objected that "Chuck never called Kareem." The trial court stated, "Again, I'm going to—I'm going to have to defer to the jury to make the findings in this case."

> The prosecutor corrected herself: "Kareem Nazari talked to Chuck Titlow on Tuesday before Ricardo's murder on Wednesday. [¶] Kareem Nazari talked to him, and Chuck told him that two black guys had pulled a gun on him." There was no objection.

> Mike asserts the prosecutor misstated the facts and introduced "a racial overtone into the case that was not present in the evidence." Following Chuck's objection, however, the prosecutor correctly described what Chuck told Nazari the day before the shooting,[10] and her argument was fair comment on the evidence. There was no error.

> [Footnote 10:] In an excerpt of Nazari's August 26, 2009, interview, he said that Milhollin told him, "We got to go, Charles is about to fight at Nation's" Meth asked what his understanding was of who Chuck was going to fight. Nazari answered, "All I know it was two black kids that live in Tara Hills." Meth asked, "When did you hear that?" Nazari

42

answered, "Tuesday night he told me about it." He confirmed it was Chuck who told him about the road rage incident.

*People v. Titlow*, 2016 WL 5121799, at *19.

The California Court of Appeal's rejection of this claim was not an unreasonable application of clearly established law from the U.S. Supreme Court. When defense counsel objected that "Chuck never called Kareem" in response to the prosecutor's argument that Chuck Titlow told Mr. Nazari that he was going to fight two black kids that lived in Tara Hills, the prosecutor changed her wording slightly and urged that the two had talked the day before the murder, and that Chuck Titlow had told Mr. Nazari "that two black guys had pulled a gun on him." RT 3609. This was a fair comment on the evidence, which was that Mr. Nazari had been asked what was his "understanding of who Charles was supposed to fight prior to you going?" and Mr. Nazari responded, "All I know is it was two black kids that live in Tara Hills." CT 1197-98. Mr. Nazari also told the detective that Chuck Titlow told him that on Tuesday night. The evidence lined up with the prosecutor's argument. Contrary to Mike Titlow's assertion, the prosecutor did not inject any race issue into the case when she identified the victim and his friend as "two black kids" because that was how they had been identified by Mr. Nazari. There was no due process violation, as the California Court of Appeal reasonably determined.

5.     Statement That Mike Titlow Hired A Lawyer For Others

Mike Titlow argues that the prosecutor argued facts not in evidence when she argued that Mike Titlow hired an attorney for two people involved in the case.

The prosecutor argued that Mike Titlow had taken various steps after the crime to avoid being held responsible for the killing, such as crafting an alibi and fabricating a story to explain the gunshot residue in the truck's cab. She also argued that Mike Titlow took steps to ensure that the witnesses did not speak against him. The prosecutor argued, among other things, that Mike Titlow told Mr. Milhollin to "take this to [his] grave" the information he had about the shooting. RT 3455. Then the prosecutor said:

> So now he has Richie under control. He's hired a lawyer to represent both Kellen and Chuck Titlow in custody. [¶] And while it may not be immediately obvious to lay people, he's hired a lawyer

43

> to represent his son and Kellen Horn. Interesting. [¶] He doesn't
> hire him to represent himself. He hires them to represent Chuck and
> Kellen so that he'll have access to the investigation as it unfolds so
> he'll know whether or not Chuck and Kellen are talking.

RT 3455.

The California Court of Appeal rejected this claim of prosecutorial misconduct. That court found that Mike Titlow had "forfeited any challenge to the prosecutor's statement because his attorney failed to object and request an admonition." *People v. Titlow*, 2016 WL 5121799, at \*19. Further, the court determined that, even if the claim was not forfeited, there was no prejudice from the argument because of the jury instructions. "The trial court instructed the jury to 'determine what facts have been proved from the evidence received in the trial and not from any other source.' (CALJIC No. 1.00) The jury was also told, 'Statements made by the attorneys during trial are not evidence.' (CALJIC No. 1.02). We presume the jury followed these instructions." *People v. Titlow*, 2016 WL 5121799, at \*20.

The prosecutor's statement did not make the trial fundamentally unfair. The prosecutor suggested to the jury that Mike Titlow was paying for lawyers for his son and Kellen Horn so he could keep track of any developments that might be adverse to him (i.e., Mike Titlow). Mr. Horn testified that Mike Titlow had offered to provide an attorney for Mr. Horn and Chuck Titlow, although he did not testify that an attorney actually was hired. Mr. Horn had testified: "I think Mike may have said something about us having a lawyer, or his lawyer would help us out if need be. . . . He never said that he was getting one. He said that if we needed one that there was one that he could get." RT 1697. The prosecutor's point was that Mike Titlow was doing things to protect himself – either by keeping witnesses quiet or by learning what they were saying to police. It was a fair inference that that goal would be promoted by hiring an attorney to represent potential codefendants, as well as by offering to hire an attorney for them or offering to share an attorney with them. "The prosecutor may argue reasonable inferences from the evidence presented." *Menendez v. Terhune*, 422 F.3d 1012, 1037 (9th Cir. 2005). The prosecutor's misstatement that an attorney actually was hired was a minor inaccuracy – Mr. Horn testified Mike Titlow offered to get him a lawyer, not that Mike had actually hired one – that did not make the trial fundamentally unfair. A misstatement of fact in the prosecutor's closing argument will not violate due process if

44

it is minor or ambiguous and the jury has been instructed that arguments by attorneys are not evidence. *Trillo v. Biter*, 769 F.3d 995, 999-1000 (9th Cir. 2014). Mike Titlow is not entitled to habeas relief on this claim.

D.     Cumulative Error Claim

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several constitutional errors may still prejudice a defendant so much that his conviction must be overturned. *See Alcala v. Woodford*, 334 F.3d 862, 893–95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution). Here, there were not multiple federal constitutional trial errors to accumulate. Mike Titlow therefore is not entitled to relief under the cumulative error doctrine.

E.     No Certificate of Appealability

A certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c). This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Accordingly, a certificate of appealability is **DENIED**.

## VI.     CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is **DENIED** on the merits. The clerk shall close the file.

**IT IS SO ORDERED**.

Dated: May 1, 2019

_____
EDWARD M. CHEN
United States District Judge